UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
WILMINGTON DIVISION

IN RE: MARY V. DIEMER,

    Debtor,    Case No.: 04-06100-8-JRL

MARY V. DIEMER,

    Plaintiff,

v.    Adversary Proceeding No.:
    04-00205-8-JRL

NELNET LOAN SERVICES, INC,

    Defendant.

---

## ORDER

The matter before the court is the complaint of Mary V. Diemer ("Diemer") against Nelnet Loan Services, Inc., ("Nelnet") to determine whether Diemer is entitled to a discharge of her student loan debt. On June 16, 2005, the court conducted a trial in Wilmington, North Carolina. Pursuant to Federal Rule of Bankruptcy Procedure 7052, this Order contains findings of fact and conclusions of law based thereon.

## FINDINGS OF FACT

1.     Diemer is a single, 41-year-old female who resides in Wilmington, North Carolina.

2.     Diemer has three children of the ages 16, 17, and 19 who reside with her. The 19-year-old is a full-time student at the University of North Carolina at Wilmington and works part-time. The 16- and 17-years-old children are unemployed.

3. Diemer has a severe case of scoliosis and suffers from neck and back pain and numbness of upper extremities. Diemer had difficulty moving her neck while testifying at trial, and the court observed Diemer's noticeable spinal curvature and disalignment of hips.

4. Between 1989 and 1995, Diemer applied for and received student loans as needed to pay for her education.

5. Diemer attended school from 1989 through 1992 at North Central State College in Ohio, and she obtained an associate degree in business hospitality management.

6. Diemer's mother died in 1992, which halted her progress in working towards another degree.

7. In 1994, Diemer started to work towards a bachelor of arts degree in business at Tiffin University. She did not complete the degree because she lacked child support and suffered from deteriorating health.

8. Diemer applied to Ohio State University and was accepted. She chose not to attend the university, as many of her credits would not transfer from North Central State College.

9. Diemer pursued employment in the field of hotel and restaurant management by submitting her resume to employers and using headhunters; however, she never secured a job in that field.

10. In 1995, Diemer began working at a convenience/grocery store in Ohio. For two years, she worked there 24 hours a week and received wages of $5.50 to $6.00 an hour. Thereafter, upon recommendation of a physician, Diemer moved to Wilmington, North Carolina to be in a warmer climate.

11. Sometime near the end of 1997 and beginning of 1998, Diemer worked at a Citgo Petroleum Corporation convenience store and made hourly wages of $6.00 an hour. She worked there

approximately 35 to 40 hours a week for a year.

12.  Thereafter, Diemer worked for The Pantry, Inc. convenience store approximately 32 hours a week making $6.30 an hour.

13.  Following her employment at The Pantry, Inc., Diemer worked at the Snack Mart convenience store for a year at approximately 35 hours a week making $6.50 an hour.

14.  Diemer then worked for Manorhouse Assisted Living in the dietary department for two years at approximately 32 hours a week making $6.50 an hour.

15.  Following that employment, Diemer worked at a WilcoHess, LLC convenience store. She worked there approximately 24 to 32 hours a week making $6.95 an hour.

16.  On August 5, 2004, while working for WilcoHess, Diemer filed for relief under Chapter 7. At the time of filing bankruptcy, Diemer was making $709.76 in net monthly income from WilcoHess.

17.  Diemer stopped working for WilcoHess after suffering back pain on the job.

18.  In 2004, Diemer was also injured in an automobile accident. Injury from that accident included pain and burning sensations.

19.  Between employment with Manorhouse Assisted Living and WilcoHess, Diemer attended vocational rehabilitation. She was informed that she was not at a level of disability to qualify for social security disability payments. She was also told that the age of her associate degree was problematic, as advancements had been made in her field of interest. Diemer pursued computer classes but stopped those classes when she obtained a job at Walgreens.

20.  Diemer briefly worked at Walgreens approximately 32 hours a week at $6.50 an hour. She was fired from that position and is now collecting unemployment checks of $137.00 a week.

21.     Diemer also receives a monthly supplemental social security disability payment in the amount of $552.00 for her 16-year-old daughter, Kelly, who suffers from both physical and mental disabilities. Kelly has a rod in her back and suffers from anxiety attacks and manic depression. Her mood swings are disrupting and violent. In the past, Kelly has run away and has attempted suicide once. She will be turning 17 in a month and a half. When Kelly reaches the age of 18, Diemer will no longer serve as payee for child social security disability payments.

22.     Diemer receives $63.36 a week in child support from her ex-spouse. She testified that this amount will not be increased and that her ex-spouse owes $28,000.00 in arrearages. Her child support will reduce next year and stop the year after as her children reach majority.

23.     Diemer has never made payments on her student loans. She has continually deferred her student loans due to insufficient income. She has remained in contact with Nelnet to arrange continuous deferments. During times of unemployment, Diemer has entered forbearance agreements. While working at Manorhouse in 2002, Diemer sought alternative repayment options. A loan officer informed Diemer of an income sensitive repayment program, whereby she would repay $250.00 to $300.00 a month. Given Diemer's circumstances, the loan officer suggested that consolidation of the student loans was a better option. In 2002, Diemer consolidated 14 student loans.

24.     Educational Credit Management Corporation ("ECMC") is the successor-in-interest to Nelnet on the student loan debt. At the time of trial, the balance was $100,490.08 accruing at a rate of $18.54 per diem.

25.     Apparent from her testimony at trial, Diemer was unaware that she would qualify for a zero repayment option through the Income Contingent Repayment Program under the William D. Ford Federal

4

Direct Loan Program. The zero repayment option is based upon her current income below the poverty line.

26.   Diemer is now seeking employment and needs to find work that is suitable for her neck and back condition. She is losing feeling in her arm. Because Diemer suffers from a degenerative condition, it is expected to progressively worsen over time. A physician has prescribed her Flexeril and Naprosyn. Diemer cannot afford health insurance to effectively treat her condition.

27.   Diemer is unable to work jobs that require lifting or standing for an extended period of time. Diemer said she cannot sit for long intervals of time, which would limit her ability to work in a traditional office setting.

28.   Based on her work history and progressive health problems, Diemer does not believe she will ever be able to repay her student loan debt.

## **CONCLUSIONS OF LAW**

A debtor's educational loans are not dischargeable in bankruptcy unless such debt "will impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). Diemer seeks to discharge her consolidated student loan on grounds of undue hardship. The Fourth Circuit Court of Appeals has adopted the test for undue hardship set forth in Brunner v. New York State Higher Education Services Corp., 831 F.2d 395 (2d Cir. 1987). Under the Brunner test, to qualify for a discharge based upon undue hardship, the debtor must establish the following factors: (1) that she cannot maintain a minimal standard of living for herself and her dependents, based upon her current income and expenses, if she is required to repay the student loans; (2) that additional circumstances indicate that her inability to do so is likely to exist for a significant portion of the repayment period of the student loans; and (3) that she has made good faith efforts to repay the loans.

Ekenasi v. The Education Resources Institute (In re Ekenasi), 325 F.3d 541, 546 (4th Cir. 2003); Brunner, 831 F.2d at 396.

Addressing the first factor, the court finds that Diemer has met her burden of establishing that she cannot maintain a minimal standard of living for herself and her dependents, based upon her current income and expenses, if she is required to repay the student loan. The court must evaluate whether the debtor has maximized her income and minimized her expenses. Perkins v. Pennsylvania Higher Education Assistance Agency (In re Perkins), 318 B.R. 300, 305 (Bankr. M.D.N.C. 2004).

When addressing the first prong of the test, the court must be sensitive to the individual circumstances of each case. Perkins, 318 B.R. at 305. The court finds that the debtor has maximized her income under the circumstances. Diemer sought employment in hotel and restaurant management by submitting resumes to employers and utilizing the aid of headhunters. Despite those attempts, Diemer was unable to secure employment in her intended field and took employment that was available to her. She has worked jobs paying less than $7.00 an hour. Diemer attended vocational rehabilitation and was told that her associate degree was outdated. Diemer is recently unemployed and lives below the poverty line. She is currently seeking employment, but she suffers from severe scoliosis that limits the types of jobs and the amount of hours that she can work. She has three children living with her. One child attends college and works part-time; however, the remaining two children are under the age of majority and are unemployed. Diemer is collecting unemployment compensation of $137.00 a week, $63.36 in child support a week, and $552.00 in supplemental social security per month for her 16-year old daughter who suffers from physical and mental disability. When she filed her petition, Diemer was making net monthly wages of $709.76 from working at WilcoHess. Her total combined monthly income, including child support and supplemental social

security, totaled $1,525.76.

The court finds that the debtor has minimized her expenses. The debtor's monthly expenses set forth in her schedules total $1,525.00. Normally, the court would raise a question as to the debtor's monthly expenses on cable television and cellular telephone totaling $115.00. It is clear, however, that any claim to disposable income will disappear in little over a year when Diemer's youngest child reaches the age of majority. At that point, the child social security disability payments will cease, and her ex-spouse's child support obligation will terminate. This is far from a case of extravagance. The debtor only pays $277.00 on monthly housing and cannot afford health insurance. Now, without employment, Diemer's expenses outpace her monthly income.

Looking at the second factor, the court concludes that Diemer met the burden of showing that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loan. Examples of "additional circumstances" are "medical problems, lack of usable job skills or severely limited education, or large number of dependents." Perkins, 318 B.R. at 310. In Ekanasi, the Fourth Circuit emphasized that, when dealing with a Chapter 7 case, the second factor of the Brunner test is based upon a "known, current situation." Ekenasi v. The Education Resources Institute (In re Ekenasi), 325 F.3d 541, 547 (4th Cir. 2003). The court, therefore, will consider Diemer's current situation and take into account her medical problems, lack of usable job skills, and the status of her dependents. First, Diemer's health is declining due to degenerative scoliosis and is not expected to improve. She suffers from neck and back pain as well as numbness to upper extremities. Visible effects from the disease were apparent in the courtroom, as Diemer had trouble moving her neck. The curvature of her spine and disalignment of her hips was also readily apparent. Her health condition limits the type of

7

employment that she can obtain. Moreover, she cannot afford health insurance to treat her condition. Secondly, Diemer's wages have remained below $7.00 an hour since 1995, and she has had difficulty maintaining employment. There is no evidence to suggest that Diemer could find a position at a higher pay level than she has held so far. As noted above, when Diemer sought vocational rehabilitation, she was told that her associate degree in business hospitality management was old, and, therefore, less marketable. Diemer has never obtained a job in hotel or restaurant management, and the prospects of that happening seem bleak based upon past experience. As for Diemer's children, all of them will reach the age of majority in little over a year. The ex-spouse's child support obligation will terminate, and it is doubtful whether Diemer will ever collect the arrears owed to her. As mentioned above, one of her children suffers from physical and mental disabilities. That child may never be able to care for herself. Once that child reaches 18, the supplemental social security payments will cease, and the child will have to qualify for adult social security disability. Diemer may have to look toward other resources to assist that child with living expenses. This second prong begs for a "certainty of hopelessness that the plaintiff will ever be able to pay." Perkins, 318 B.R. at 310. The court believes the facts of this case reflect a certainty of hopelessness.

Perhaps the most contentious issue involves the third factor of the test, which requires the debtor to make good faith efforts to repay the loans. Diemer has never made payments on student loans; however, that in itself does not constitute lack of good faith. Perkins, 318 B.R. at 312 ("failure to make payments will not preclude a finding of good faith if the debtor had no funds available for payment toward the loan"); Tennessee Student Assistance Corp. v. Mort (In re Mort), 272 B.R. 181, 185 (W.D. Va. 2002) (failure to make payments on student loan debt does not independently show lack of good faith for dischargeability purposes); Elebrashy v. Student Loan Corp. (In re Elebrashy), 189 B.R. 922, 928 (Bankr. N.D. Ohio

8

1995) (finding of good faith was not precluded where debtor had no funds to make repayments); <u>Hawkins v. Buena Vista College (In re Hawkins)</u>, 187 B.R. 294, 299 (Bankr. N.D. Iowa 1995) (no lack of good faith where debtor made effort to obtain suitable employment but had no ability to repay); <u>Conner v. Ill. State Scholarship Comm'n (In re Conner)</u>, 89 B.R. 744, 749 n. 18 (Bankr. N.D. Ill. 1988) ("failure to make even a minimal repayment will not, however, result in a finding of lack of good faith when a debtor clearly has no funds to make any repayment"); <u>Courtney v. Gainer Bank (In re Courtney)</u>, 79 B.R. 1004, 1011 (Bankr. N.D. Ind. 1987) ("the mere failure to make a minimal payment on a student loan does not prevent a finding of good faith where the debtor never had the resources to make payment").

When analyzing this third factor, the court must again consider the debtor's efforts to obtain suitable employment, to maximize her income, and to minimize her expenses. <u>Perkins</u>, 318 B.R. at 311. Evidence supports that the debtor has never had the ability to make repayments on the loan despite her attempt to find suitable employment. As noted above, the debtor testified that she actively submitted resumes to employers and obtained the assistance of headhunters in her pursuit of a job in hotel or restaurant management; however, she never secured a position in her intended field. While she had plans to obtain a four-year business degree, the death of her mother, her lack of child support, her deteriorating health, and her difficulty in transferring credits seemed to undermine that plan. Because she was unable to obtain work in her field of choice, Diemer took the employment that was available to her. Based on Diemer's work history and the results of vocational rehabilitation, Diemer's ability to ever enter her chosen field seems unlikely.

As noted above, at the time of filing bankruptcy, Diemer's living expenses were $1,525.00, and her monthly income was $1,525.76, which included child support and supplemental social security for her

9

daughter. Based on an analysis of Diemer's income and expenses listed in her schedules, the court finds that Diemer maximizes her income, and her living expenses cover only her basic needs. As noted above, while the monthly expenditure on cable television and cellular service appear somewhat extraneous, the $115.000 expended monthly on those services will disappear in just over a year when the debtor loses child support and supplemental social security disability for her daughter.

Despite her inability to make repayments, evidence supports that Diemer has not abandoned her responsibilities with respect to the loans. During the repayment period, she has remained in contact with loan officers to continually arrange deferment and forbearance agreements. Moreover, in 2002, Diemer sought alternative ways to repay her student loans. A loan officer informed her of an income sensitive repayment program whereby she would have a reduced monthly payment of approximately $250.00 to $300.00. However, given her financial circumstances, she could not afford the reduced payments under that program and was informed that a better option was to consolidate her loans. Thereafter, Diemer consolidated 14 student loans. The court finds that Diemer's continual contact with loan officers, arrangement of deferment and forbearance agreements, her 2002 effort to find a suitable repayment plan, and her consolidation of the loans constituted good faith on her part. *See* Floyd v. Educational Credit Management Corp., 54 Fed.Appx. 124, 126 (4th Cir. 2002)(finding of good faith where debtor kept in frequent contact with lenders, arranged for deferral, negotiated a forbearance, made partial payment for only a year until unemployed, and investigated the possibility of consolidation and other repayment options).

However, even after filing an adversary proceeding to discharge a student loan, the debtor's obligation to make good faith efforts to repay the loan is not extinguished. Murphy v. CEO / Manager,

Sallie Mae (In re Murphy), 305 B.R. 780, 799 (Bankr. E.D.Va. 2004). The United States Department of Education offers a number of repayment plans for student loans. Nelnet asserts that Diemer could participate in the Income Contingent Repayment Program under the William D. Ford Federal Direct Loan Program. Under that program, Diemer would pay 20% of discretionary income or the amount the debtor would pay if the debt were repaid in twelve years, whichever is less. 34 CFR § 685.209(a)(2). Diemer's income is below the poverty line, and she lacks discretionary income. Both parties agree that her repayment would be zero under the plan at this time. Of course, her monthly repayment amount would be adjusted each year to reflect any changes in her circumstances. 34 CFR. § 685.209(a)(5). The repayment period would last a maximum of 25 years. 34 CFR § 685.209(c)(4)(I).

While counsel for Nelnet proffered that she had sent a packet regarding the Income Contingent Repayment Plan to Diemer's counsel on April 11, 2005, no evidence of receipt of that information was presented at trial, and it was readily apparent from Diemer's testimony that she had no knowledge of a zero repayment option before it was mentioned to her on cross-examination. In Murphy v. CEO / Manager, Sallie Mae (In re Murphy), 305 B.R. 780, 799 (Bankr. E.D. Va. 2004), the court noted that, where a debtor initially learns about the Income Contingent Repayment Program during trial of an adversary proceeding, the bankruptcy court may consider whether discussions regarding such program have taken place to assess good faith or lack thereof. Here, it was obvious to the court that Diemer had not learned of the zero repayment option prior to stepping on the witness stand, and no evidence was presented to establish the contrary. Moreover, in 2002, Diemer sought information regarding alternative repayment plans and was apparently not informed of a zero repayment option, as she believed her best option was to consolidate the loans. Lack of knowledge of the Income Contingent Repayment Program cannot constitute

bad faith.

It should be noted that the "Income Contingent Repayment Plan cannot trump the Congressionally mandated individualized determination of undue hardship." <u>Strand v. Sallie Mae Servicing Corp. (In re Strand)</u>, 298 B.R. 367, 376 (Bankr. D. Minn. 2003). It is "one factor to be considered in determining under hardship, but it is not determinative." <u>Id</u>.; *see also* <u>Murphy</u>, 305 B.R. at 799 (stating that the William D. Ford Program is no "silver bullet"). Counsel for Diemer asserts that the loans discharged at the end of the 25-year repayment period would be taxable income and that the debtor would be strapped with a huge tax liability at age 66. Counsel for Nelnet argues that the projected tax treatment is speculative at best and that the IRS is authorized to forgive tax debt through offers of compromise when there is doubt as to collectibility. 26 C.F.R. § 301.7122.-1. Excluding the associated tax implications, if the debtor participates in this Income Contingent Repayment Plan, she will carry a burden on her shoulders for the majority of her adult life that will preclude her from obtaining credit that she may need in the future to assist with basic living expenses and medical expenses associated with her severe scoliosis. The court has found a sufficient showing of good faith on the part of the debtor, and she will not be forced to participate in the Income Contingent Repayment Plan.

## **CONCLUSION**

Based on the foregoing, the court finds that Diemer has made the requisite showing of undue hardship. Pursuant to 11 U.S.C. § 523(a)(8), the student loan debt owed by Diemer to Nelnet and/or

ECMC, as successor-in-interest to Nelnet, is discharged.

**So Ordered.**

**Dated:  June 29, 2005**

_____
J. Rich Leonard
United States Bankruptcy Judge